**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

UNITED STATES OF AMERICA,

      Plaintiff,

   v.                                      No. 1:20-cr-82-WJ

HASSAN ALQAHTANI,

      Defendant.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS OR, IN THE ALTERNATIVE, MOTION FOR A HEARING PURSUANT TO FRANKS V. DELAWARE**

**THIS MATTER** is before the Court on Defendant's Motion to Suppress or, in the alternative, Motion for a Hearing pursuant to _Franks v. Delaware_, 438 U.S. 154 (1978) [Doc. 22], filed April 10, 2020. Defendant is charged with Nonimmigrant Alien in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(5)(B). On December 12, 2019, FBI agents searched Defendant's home pursuant to a search warrant authorized by United States Magistrate Judge Karen B. Molzen. During the search, FBI agents seized a .380 caliber firearm, ammunition, and a box for the firearm. Defendant requests that the Court suppress the evidence seized from the search on the basis that the affidavit in support of the search warrant did not establish probable cause. In the alternative, Defendant requests that the Court hold a _Franks_ hearing. For the reasons stated in this Opinion, the Court finds that the affidavit in support of the search warrant established probable cause and that Defendant has not made the requisite showing to entitle him to a _Franks_ hearing.

The Court did not hold an evidentiary hearing on Defendant's motion because the only evidence at issue is the sufficiency of the affidavit in support of the search warrant, which Defendant submitted to the Court as his first exhibit. _See United States v. Edgeworth_, 889 F.3d

1

350, 353 (7th Cir. 2018) ("It is well established that evidentiary hearings are not required as a matter of course. . . . District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion."). Moreover, Defendant did not offer any reasons as to why an evidentiary hearing was needed, and the Court agrees with United States that an evidentiary hearing was not needed.

**I.      The Affidavit in Support of the Search Warrant [Doc. 22-1]**

FBI Special Agent Jonathan Labuhn authored the affidavit in support of the search warrant. The affidavit consists of 14 paragraphs, each of which is described in this section of the Opinion.

Agent Labuhn begins the affidavit explaining that he has been employed by the FBI since March 2019, is assigned to the FBI's Albuquerque Division, and has been trained by experienced agents and detectives on investigating violent crimes. He then describes his investigative training and experience, stating that it "includes conducting surveillance; interviewing subjects, victims, and witnesses; writing affidavits for and executing search and arrest warrants; managing cooperating sources; issuing subpoenas; collecting evidence; and analyzing public records."

In paragraph 3, Agent Labuhn explains that the affidavit is "in support of a search warrant for the property being used by HASSAN ALQAHTANI in furtherance of [a] violation of 18 U.S.C. § 922(g)(5)(B)." He then describes the "target residence" and Defendant's connection to it:

A two bedroom, one bathroom, single-story home in the North Campus neighborhood in Albuquerque, New Mexico. The address of the Target Residence is 1305 Columbia Drive North East Albuquerque, New Mexico.

ALQAHTANI shares the home with Sierra Kole Shafer. FBI has conducted surveillance on the Target Residence. On October 31, 2019 Special Agents observed a white Cadillac, bearing New Mexico state tag 4236WL parked in the drive way of the Target Residence facing the garage. The vehicle was registered to HASSAN ALQAHTANI. On November 5, 2019, an individual exited the front and appeared to lock the door who bore a resemblance to the driver's license photo of

HASSAN ALQAHTANI, DOB 04/03/1992, the registered owner of the white Cadillac.

On 11/18/2019 the property management company responsible for 1305 Columbia Drive North East Albuquerque, New Mexico, Coldwell Banker Real Estate provided the affiant with a copy of the lease for the Target Residence which confirmed that HASSAN ALQAHTANI lives at the residence with Sierra Kole Shafer. Employees of Coldwell Banker Real Estate verbally confirmed that both HASSAN ALQAHTANI and Sierra Kole Shafer reside at 1305 Columbia Drive North East Albuquerque, New Mexico.

In paragraph 4, Agent Labuhn states that the facts described in the affidavit's remaining paragraphs establish that "there is probable cause to believe that the Target Residence is being used by ALQAHTANI, and a firearm is stored at the Target Residence." Then, in paragraph 5, Agent Labuhn explains that the information in the "Affidavit is based on [his] personal involvement in the investigation; law enforcement reports, records, and interviews; information received from other law enforcement agents; [his] experience and training; and the experience of other law enforcement agents." Agent Labuhn also explains that because of the "Affidavit's limited purpose, it does not contain all of the facts known to [him] or the other law enforcement officers about the investigation" and that he has "set forth only those facts that [he] believe[s] are necessary to establish probable cause in support of th[e] search warrant."

In paragraph 6, Agent Labuhn discusses the tip that the FBI received about Defendant and the information he learned about Defendant when interviewing the person who provided the tip:

On August 8, 2019, a tip was submitted by R.V. to the FBI National Threat Operations Center (NTOC) via tips.fbi.gov, to report Saudi Arabian citizen HASSAN ALQAHTANI, address 1305 Columbia Dr NE, Albuquerque, NM 87106, was creating a "list of people who he wants to kill before he leaves the US" consisting of R.V., and professors from University of New Mexico in Albuquerque, NM. The tip also stated ALQAHTANI had possession of a firearm belonging to his American girlfriend. The affiant conducted an interview with R.V. on September 6, 2019, where R.V. described ALQAHTANI's firearm as a colored hand gun and that ALQAHTANI was aware that he should not have the firearm. The R.V. clarified that ALQAHTANI owned the firearm but had stated that if ALQAHTANI were to get in any trouble with the firearm his girlfriend would take possession of

it and hide it for him.

In paragraphs 7 and 8, Agent Labuhn explains that the FBI interviewed R.V. a second time

and describes the information Agent Labuhn learned about Defendant from that interview:

> On October 3, 2019 R.V. was interviewed again where he confirmed that
> ALQAHTANI had shown him a colored hand gun. ALQAHTANI claimed that his
> cousin, another Saudi Arabian citizen, had purchased the firearm while in the
> United States and gave it to ALQAHTANI when the cousin had returned to Saudi
> Arabia. R.V. recounted that ALQAHTANI stated he should not have the firearm.
> ALQAHTANI claimed he would state the firearm was his girlfriend's if he was
> ever in trouble with the authorities.
>
> ALQAHTANI was invited shooting with R.V. and others on numerous occasions.
> Before going to the outings ALQAHTANI would ask R.V., on occasions when
> ALQAHTANI brought the firearm with him, if R.V. would "hold his gun" during
> transport from ALQAHTANI's residence to the site. R.V. believed this was
> because ALQAHTANI knew it was not legal for him to be in possession of the
> firearm. R.V. never saw ALQAHTANI bring his firearm to any of these outings.

In paragraph 9, Agent Labuhn explains that he conducted an interview with a second person

about Defendant and describes the information he learned about Defendant from that interview:

> The affiant conducted an interview with A.M. who claimed that in the July 2019,
> A.M. met ALQAHTANI at the Target residence. During this meeting,
> ALQAHTANI went into a room further in his residence and retrieved a firearm to
> show to A.M. A.M. claimed it had a coating that made the firearm appear colored.
> When A.M. unloaded the firearm, A.M. saw 9mm rounds in the magazine.
> ALQAHTANI was surprised when A.M. unloaded his firearm and asked A.M. to
> teach him how to unload the firearm. At this same meeting, ALQAHTANI claimed
> to A.M. that he knew he was not allowed to own the firearm and that if he was in
> trouble with the firearm would claim that the firearm belonged to his girlfriend.

In paragraph 10, Agent Labuhn provides more information he learned about Defendant:

On 11/14/2019, an Albuquerque confidential human source (CHS),[1] reported that
ALQAHTANI approached them interested in purchasing a firearm. The CHS,
reported that ALQAHTANI was interested in purchasing the CHS's firearm but
was also interested in purchasing an AK-47. ALQAHTANI showed the CHS videos
of Saudi Arabian wedding with individuals shooting AK-47s. ALQAHTANI told
the CHS that he did not like his old gun and wanted to purchase another firearm

---

[1] The United States explained that Agent Labuhn was referring to A.M. as the "Albuquerque confidential human source" because "by November of 2019, A.M. had gained Confidential Human Source status with the FBI after going through their vetting process." Doc. 24 (United States' Response) at 13.

before his family arrived.

In paragraph 11, Agent Labuhn explains that "the handgun appears to meet[] the federal definition of a 'firearm'" because he is "not aware of any firearms that are manufactured in the state of New Mexico." Then, in paragraph 12, he states that "[a]ccording to information provided by Immigration and Custom Enforcement, HASSAN HUSSAIN ALQAHTANI . . . is a Saudi Arabian citizen admitted to the United States on a non-immigrant F1 student visa."

In paragraph 13, Agent Labuhn states that based on the facts in the affidavit, "HASSAN ALQAHTANI has in his possession a firearm and as a nonimmigrant F1 student visa holder, is in violation of 18 U.S.C. § 922(g)(5)(B)." And in the final paragraph of the affidavit, Agent Labuhn requests "permission to search for firearms and firearm related materials that might be found in the Target Residence" because "[t]here is probable cause to believe that a firearm is stored [there]."

## II.     The Affidavit in Support of the Search Warrant was Supported by Probable Cause

"A search warrant can issue only upon a showing of probable cause. The supporting affidavit must provide a 'substantial basis' to conclude that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014) (citations omitted). "In assessing whether a search warrant is supported by probable cause, a magistrate's determination of probable cause must be given considerable deference." *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d 868, 872 (10th Cir. 1992).

On its face, Agent Labuhn's affidavit satisfies the probable cause standard: R.V. and A.M., whose accounts were largely corroborated by each other, both described seeing Defendant possess a firearm he knew he was not permitted to have; A.M. provided the nexus between the firearm and the target residence by explaining that, while he was at the target residence, Defendant went into

5

a room and retrieved a firearm to show him; FBI surveillance confirmed Defendant lived at the target residence; and Agent Labuhn verified that Defendant was admitted to the United States on a non-immigrant F1 student visa, thereby, making Defendant's possession of a firearm a violation of 18 U.S.C. § 922(g)(5)(B). Accordingly, the Court finds that probable cause existed because the affidavit provided a substantial basis to conclude that there was a fair probability that evidence of Defendant violating 18 U.S.C. § 922(g)(5)(B) would be found at the target residence.

Defendant, however, argues that Agent Labuhn's affidavit "is so lacking in probable cause that it provided an insufficient basis to issue the warrant." Doc. 22 (Defendant's Motion) at 7. Defendant first explains that the "[a]ctual so-called 'facts' in the Affidavit militate against the probable cause" and then goes through each paragraph of the affidavit in a rambling manner commenting on what he believes the affidavit is lacking. *Id.* at 7–11. For example, Defendant explains that the "affidavit is completely devoid of the affiant's expertise regarding where firearms may be kept," "the affiant inexplicably waited almost a month to interview R.V.," "the affiant made no efforts to query whether or not Hassan had any plans to leave the country," and "[t]he Affidavit is critically deficient in addressing why an item as portable as a firearm would still be at the Target Residence when the authorization to search was sought by the affiant." *Id.* The purpose of the affidavit, however, was to establish probable cause that evidence of Defendant violating 18 U.S.C. § 922(g)(5)(B) would be found at the target residence, not to provide a comprehensive report of the FBI's investigation into Defendant. *See* Doc. 22-1 (Affidavit) at 2 ("Because of this Affidavit's limited purpose, it does not contain all of the facts known to me or the other law enforcement officers about the investigation."). After reviewing the affidavit, the Court is satisfied that it met the probable cause standard for the reasons stated in the previous paragraph.

Defendant next explains that the "[a]ffidavit fail[ed] to establish the credibility and

reliability of its unnamed sources." *Id.* at 11. Defendant is correct that Agent Labuhn's affidavit is silent as to R.V. and A.M.'s credibility and reliability. However, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). As previously explained, R.V. and A.M.'s accounts of Defendant possessing a firearm were largely corroborated by each other, and the FBI's surveillance of Defendant independently corroborated R.V. and A.M.'s statements that Defendant resided at the target residence. Moreover, R.V. and A.M. were inherently more reliable than an anonymous tipster because they each participated in interviews with the FBI, so the FBI knew who they were and could hold them responsible if their allegations turned out to be fabricated. *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002) (explaining that the police could have held the "[informant] responsible if his allegations turned out to be fabricated" and that "[t]his provides a disincentive for making false allegations").

Defendant next claims that the "[a]ffidavit fails to establish a nexus between the property sought and the place to be searched." Doc. 22 (Defendant's Motion) at 11. That argument, however, fails because Agent Labuhn established the nexus in paragraph 9 of the affidavit:

> The affiant conducted an interview with A.M. who claimed that in the July 2019, A.M. met ALQAHTANI at the Target residence. During this meeting, ALQAHTANI went into a room further in his residence and retrieved a firearm to show to A.M.

Defendant's final argument concerning probable cause is that the affidavit's description of A.M. seeing Defendant with a firearm at the target residence in July 2019 was too stale to establish probable cause for a search of the target residence in December 2019. Doc. 22 (Defendant's Motion) at 12–13. "[W]hether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004) (quoting *United States v.*

*Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990)). Although A.M.'s sighting of the firearm at the target residence was approximately five months prior to when the search of the target residence was authorized and executed, the affidavit's timeline of the investigation establishes that probable cause existed to believe that a firearm would be found at the target residence in December 2019:

- July 2019: Defendant showed A.M. a firearm at the target residence and told him that if he was ever in trouble for having the firearm, he would claim it belonged to his girlfriend.

- August 2019: R.V. submitted a tip to the FBI stating that Defendant possessed a firearm.

- September 2019: R.V. explained during an interview that Defendant possessed a firearm and that if he were to get in trouble for it, his girlfriend would take possession of it.

- October 2019: R.V. explained during a second interview that Defendant had shown him the firearm and that he would say the firearm was his girlfriend's if ever caught with it.

- November 2019: A confidential human source, who we now know was A.M., explained that Defendant told him that he did not like his old firearm and that he wanted to purchase another one. The FBI also confirmed Defendant lived at the target residence with a woman.

Based on the affidavit's timeline, there existed a fair probability that a firearm would be found at the target residence in December 2019 for the following reasons: in the months after A.M. saw Defendant with a firearm at the target residence, R.V. explained to the FBI three different times that Defendant possessed a firearm; approximately one month prior to the search of the target residence, Defendant explained to A.M. that he did not like his old firearm and that he wanted to purchase another one; and it makes sense that Defendant would have kept the firearm at the target residence, with which he shared with a woman (presumably his girlfriend), because his plan to avoid responsibility for the firearm was to have his girlfriend claim it was hers. Accordingly, the Court finds that the affidavit, when reviewed in its entirety, was not based on facts that were too

stale to establish probable cause to search for a firearm at the target residence in December 2019.

**III.    Defendant has Not Made the Requisite Showing to Entitle him to a *Franks* Hearing**

"Under *Franks*, a Fourth Amendment violation occurs if '(1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued.'" *United States v. Moses*, 2020 WL 4045619, at *3 (10th Cir. 2020) (quoting *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015)). "If a defendant makes a 'substantial preliminary showing' that both of these elements exist, he is entitled to an evidentiary hearing to prove a *Franks* violation." *Id.* (citing *Franks*, 438 U.S. at 155). "Such a substantial preliminary showing requires more than mere allegations of defects in a warrant. A defendant must produce evidence of the complained-of defects by offering "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Id.* (quoting *Franks*, 438 U.S. at 171). "If the defendant cannot produce such evidence, he must explain why he cannot do so." *Id.* (citing *Franks*, 438 U.S. at 171).

Defendant argues that the "affidavit of Hassan Alqahtani (Exhibit 2) and the filed Criminal Complaint (Exhibit 3) clearly provide a 'substantial preliminary showing' of numerous material misstatements and omissions which necessitate a hearing pursuant to *Franks*." Doc. 22 (Defendant's Motion) at 14. Defendant alleges the following misstatements and omissions:

- Agent Labuhn omitted the fact that the confidential human source was A.M.

- Agent Labuhn did not explain that the term "kill list" came from R.V., not Defendant.

- Agent Labuhn misstated the interaction between A.M. and Defendant in November 2019. According to Defendant, he did not approach A.M. to purchase a firearm; instead, A.M. sought out Defendant and was the one who brought up selling a firearm to Defendant.

- Agent Labuhn omitted the fact that on December 4, 2019, Defendant told A.M. that he was

no longer interested in an AK-47 rifle.

▪ Agent Labuhn did not explain that Defendant desired to find a job so he could stay in the United States after he graduated from the University of New Mexico.

▪ Agent Labuhn failed to mention that Defendant and R.V. were involved in an altercation with each other the day before R.V. submitted the tip about Defendant to the FBI.[2]

▪ Agent Labuhn omitted the fact that A.M. was a teacher's assistant who held great influence over Defendant's grades.

▪ Agent Labuhn did not state whether A.M. or R.V. had ever been arrested.

As an initial matter, Defendant is not entitled to a *Franks* hearing because he has not shown that the alleged misstatements and omissions were reckless. "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. Similar to the defendant in *United States v. Campbell*, "Defendant has not revealed or provided any evidence in the record of an intent to mislead or recklessness on the part of the officers." 603 F.3d 1218, 1229 (10th Cir. 2010).

Even if Defendant had shown that the alleged misstatements and omissions were reckless, Defendant would still not be entitled to a *Franks* hearing because the alleged misstatements and omissions are not material. Misstatements and omissions are material only if they negate the finding of probable cause. *See Moses*, 2020 WL 4045619, at *3 (stating that a "misstatement or omission . . . is material because, but for it, the warrant could not have lawfully issued"); *see also Stewart v. Donges*, 915 F.2d 572, 583 n.13 (10th Cir. 1990) ("Whether the omitted statement was

---

[2] The Court is not convinced that Defendant and R.V. were involved in an altercation with each other the day before R.V. submitted the tip about Defendant to the FBI. Agent Labuhn's affidavit makes clear that R.V. submitted the tip on August 8, 2019. Defendant's affidavit [Doc. 22-2], which Defendant is supposedly relying on for this statement, provides that Defendant's altercation with R.V. was on August 27, 2019, approximately three weeks after the tip.

material is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant."). None of the alleged misstatements and omissions undermine the facts in Agent Labuhn's affidavit that gave rise to probable cause that evidence of Defendant violating 18 U.S.C. § 922(g)(5)(B) would be found at the target residence: R.V. and A.M., whose accounts were largely corroborated by each other, both described seeing Defendant possess a firearm he knew he was not permitted to have; A.M. provided the nexus between the firearm and the target residence by explaining that, while he was at the target residence, Defendant went into a room and retrieved a firearm to show him; FBI surveillance confirmed Defendant lived at the target residence; and Agent Labuhn verified that Defendant was admitted to the United States on a non-immigrant F1 student visa, thereby, making Defendant's possession of a firearm a violation of 18 U.S.C. § 922(g)(5)(B).

## CONCLUSION

For the foregoing reasons, the Court finds that probable cause existed because Agent Labuhn's affidavit provided a substantial basis to conclude that there was a fair probability that evidence of Defendant violating 18 U.S.C. § 922(g)(5)(B) would be found at the target residence. The Court also finds that Defendant has not made the requisite showing to entitle him to a *Franks* hearing. Accordingly, Defendant's Motion to Suppress or, in the alternative, Motion for a Hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) [Doc. 22] is **DENIED**.

**IT IS SO ORDERED**.

_____

**CHIEF UNITED STATES DISTRICT JUDGE**